IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LA'DRINA SWEENEY-EMANUEL, | ) | Civil No.: 3:11-cv-00962-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Lisa R. J. Porter
KP Law LLC
16200 SW Pacific Highway
Suite H-280
Portland, OR 97224

       Attorney for Plaintiff

S. Amanda Marshall, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

David J. Burdett
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 901
Seattle, WA 98104

     Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff La'Drina Sweeney-Emanuel brings this action pursuant to 42 U.S.C. § § 405(g) and 1383(c)(3), 28 U.S.C. § § 1331, 1361, and 2201, and the United States Constitution, seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI) under the Social Security Act (the Act).[1]

For the reasons set out below, the Commissioner's decision should be reversed and the action should be remanded for further proceedings.

## **Procedural Background**

Plaintiff filed an application for SSI on January 12, 2007, alleging that she had been disabled since June 15, 2005.

Plaintiff's claim was denied initially on April 2, 2007 and was denied upon reconsideration on August 10, 2007.  She timely requested an administrative hearing, and a hearing was held before Administrative Law Judge (ALJ) Richard Say on August 11, 2009. Plaintiff and Nancy Bloom, a Vocational Expert (VE), testified at the hearing.

In a decision filed on November 27, 2009, ALJ Say found that Plaintiff was not disabled

---

[1]In her complaint, Plaintiff cited these bases of the court's jurisdiction.  In her opening memorandum, however, she cites only 42 U.S.C. § 405(g) as the source of jurisdiction.

within the meaning of the Act.  That decision became the final decision of the Commissioner on June 24, 2011, when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff challenges that decision.

## Background

Plaintiff was born on June 17, 1960, and was 49 years old at the time of the hearing.  She graduated from high school and completed three years of college, and has past relevant experience as child care worker, teacher's aid, and receptionist.  Plaintiff last worked in July, 2005.  She testified that she stopped working when her doctor "released her from work."

Plaintiff alleges that she is disabled because of Post Traumatic Stress Disorder (PTSD), anxiety, depression, insomnia, asthma, obesity, anemia, migraine headaches, diverticulitis, fatigue, myometrial fibroid producing dysmenorrhea, an ovarial cyst, diabetes, and hypertension. She asserts that her sleep disorder is the most serious of these impairments.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

FINDINGS AND RECOMMENDATION - 3

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that

the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  <u>Tackett</u>, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  <u>Id.</u>

## <u>Medical Record</u>

Plaintiff was diagnosed with diverticulosis following a colonoscopy on April 25, 2005.

On May 6, 2005, Dr. DeMots, a cardiologist, diagnosed Plaintiff with diabetes mellitus, hypertension, and chest wall pain.  Plaintiff was unable to complete a cardiology exam Dr. DeMots conducted on May 23, 2005, because her blood pressure became too high and she experienced severe fatigue after walking for six minutes.

Plaintiff was diagnosed with asthma on June 24, 2005.

On July 1, 2005, Dr. King noted that Plaintiff had baggy eyes and appeared to be tired. In a letter dated July 6, 2005, Dr. King asked that Plaintiff be released from work for "severe medical issues" that required her absence.

An MRI taken on July 5, 2006 showed degenerative changes in Plaintiff's lower lumbar spine.

During a visit on February 13, 2006, Dr. DeMots noted that Plaintiff did not have shortness of breath or any cardiovascular symptoms, but had been experiencing severe migraines.

On April 18, 2006, Dr. Lochner noted that Plaintiff was exhausted and reported that she was unable to sleep.  Plaintiff told Dr. Lochner that she wanted to fix the underlying problem

rather than take pills.  On May 15, 2006, Dr. Lochner indicated that he suspected that Plaintiff's poor sleep was related to her depression.

Louise Gordon, MA, PLC, performed a mental health evaluation on June 8, 2006.  She reported that Plaintiff was dysphoric and exhibited a restricted affect.  Gordon opined that Plaintiff met the diagnosis for major depressive disorder and generalized anxiety disorder.  She provisionally diagnosed PTSD, noting that Plaintiff had some symptoms that were consistent with that disorder, but thought that more information was needed in order for that diagnosis to be made.   Gordon rated Plaintiff's global assessment of functioning (GAF) score as 75.

On June 20, 2006, FNP Lallande, Plaintiff's primary care provider, provided Trazodone to help Plaintiff sleep, and referred Plaintiff for a sleep consultation.  Plaintiff subsequently stopped using that medication, citing increased anxiety, and her dosage of Zoloft was increased to treat her depression and persistent insomnia.

On August 15, 2006, Plaintiff told her medical provider that she had forgotten her paperwork and had been forgetting to check her blood sugars.  She asked for a note stating that her depression had caused her to miss classes and an interview for an intern position.  On August 17, 2006, Lallande noted that Plaintiff's insomnia and depression were not well controlled, opined that, because of her insomnia, hypertenison, depression, and diabetes, she should not participate in a DHS program.  On September 15, 2006, Lallande recommended that Plaintiff not return to work until a sleep study had been conducted and she was feeling well.

On October 27, 2006, Dr. Cigarroa, a cardiologist,  reported that Plaintiff experienced significant fatigue, exertional dyspnea, and insomnolence.

In chart notes dated October 30, 2006, FNP Lallande stated that Plaintiff had developed panic attacks associated with PTSD and "current stressors."  She prescribed a trial of Klonopin.

On November 6, 2006, Lallande diagnosed PTSD, which she attributed to domestic violence by Plaintiff's husband.

Plaintiff attended a sleep disorder clinic on December 21, 2006.  She reported that she napped involuntarily, had problems falling asleep and staying asleep, and was fatigued during the day even if she slept 8 to 10 hours at night.  The clinic noted that Plaintiff's medical problems included asthma, GERD, hypertension, high cholesterol, depression, headaches and migraines, anxiety, PTSD, diabetes, a history of anemia, and a severely restricted throat opening.

On February 5, 2007, FNP Lallande noted that Plaintiff appeared to be tired, and that her depression was stable and her hypertension was well controlled.  Dr. DeMots, Plaintiff's cardiologist, also noted that Plaintiff was tired and lethargic during an office visit on April 13, 2006.

Chart notes dated April 23, 2007 state that a sleep study had shown that Plaintiff did not experience REM sleep, and a prescription for Wellbutrin was added to the Zoloft that Plaintiff was already taking for sleep related problems.   On May 10, 2007, FNP Lallande reported that the sleep study had shown that Plaintiff experienced "fragmented, nonrestorative sleep with frequent arousals."  She added that Trazodone and Wellbutrin did not improve Plaintiff's sleep or lessen her fatigue.  Plaintiff told Lallande that she felt "harassed by Welfare workers regarding her participation in [a] return to work program."

An MRI performed on February 20, 2009 showed extensive meniscal degeneration and complex tears in Plaintiff's right knee, and arthroscopic surgery was performed on April 15, 2009.  On May 21, 2009, Dr. Herzka noted that Plaintiff had knee pain when walking after sitting for 15 minutes or more, and experienced significant swelling in her knee during the evening.  He observed that Plaintiff had poor balance and fatigued quickly.  During a physical

therapy session on September 9, 2009, Plaintiff reported that she "doesn't do anything at home," and complained of insomnia, decreased energy, dizziness, back pain, and severe knee pain. The physical therapist opined that, if she followed through with her home exercise program, her potential for rehabilitation was good.

In a letter dated August 6, 2009, Kim Walen, LPC, Plaintiff's primary mental health counselor, reported that Plaintiff's counseling sessions had focused on reducing Plaintiff's anxiety and panic attacks. She noted that, during the 14 months that Plaintiff had been receiving counseling services, Plaintiff had attended 32 counseling sessions, and had missed or needed to reschedule 13 sessions. Walen opined that, given her ongoing symptoms and inability to keep regular counseling appointments, Plaintiff "may not be able to adhere to a regular work schedule."

On September 14, 2009, Plaintiff was diagnosed with positional vertigo. On September 23, 2009, Dr. Rikevich noted that Plaintiff reported chest pain and dizziness. He indicated that Plaintiff's hypertension was "finally well controlled," and recommended that Plaintiff walk briskly for 30 minutes 5 to 7 days per week. Dr. Rikevich urged Plaintiff to continue to be active and not to worry, because her chest pain was not caused by her heart.

FNP Lallande evaluated Plaintiff's ability to perform work-related functions in a report dated August 9, 2009. She listed Plaintiff's diagnoses as including insomnia, diabetes, left ventricular hypertrophy, hypertension, high cholesterol, asthma, chronic chest pain, degenerative joint disease, a meniscal tear, PTSD, chronic fatigue, headaches, panic attacks, problems with memory and concentration, heartburn, and diverticulitis. FNP Lallande opined that Plaintiff could not perform even "low stress" jobs because her chronic insomnia caused exhaustion, memory and concentration problems, and panic attacks. She opined that Plaintiff could

stand/walk/sit less than 2 hours during a workday, and that Plaintiff would need to lie down three times a day because of knee pain. FNP Lallande stated that hypertension, diabetes, obesity, and lack of restorative sleep caused overall weakness, and opined that Plaintiff would miss more than four days of work per month because of her impairments.

**Hearing Testimony**

**Plaintiff**

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff has four children, two of whom were living with her full-time at the time of the hearing. Plaintiff's children did most of the housework: they did the cooking. laundry, and dishes; helped Plaintiff shop; and calmed her during her frequent panic attacks. She cannot drive.

Plaintiff's health deteriorated significantly in 2005, and at the time of the hearing she experienced as many as six panic attacks per day. Lorazepam did not help to clam her; Trazodone increased her anxiety and did not help her sleep. Plaintiff "shuts down" and refuses to talk when she has a panic attack. Because of her fatigue, simple chores that she used to be able to carry out in a half-hour took several hours to complete. Because she could not sleep, Plaintiff moved from the couch to the recliner at night in an effort to find a comfortable place. She tore her right meniscus, and had knee surgery in April, 2009. Plaintiff had degenerative arthritis in both knees, and could lift only 10 pounds without hurting herself. She could sit for 15 minutes and stand for 10 minutes at a time, could walk only a couple blocks, and experienced pain when she climbed the stairs in her home. Plaintiff spent 60% of her day lying down or in a recliner, and rarely left the house.

Insomnia had caused Plaintiff to miss work and lose a job at Techtronics. Her symptoms had also caused her to miss about one day of work a week at KinderCare, where she had last worked. KinderCare had attempted to accommodate Plaintiff's disability by reducing and altering her hours, but Plaintiff's doctor ultimately wrote a "release from work" there because of Plaintiff's disabilities. Plaintiff could not perform any of her former jobs because she lacked the ability to focus or the energy to concentrate for two hours at a time, and could not work at a fast pace.

Because of her fatigue and anxiety, Plaintiff could not leave her house to see her therapist more than once a month. Plaintiff's insomnia and non-restorative sleep caused her to fall asleep randomly during the day, and to be short tempered and impatient with others. When reading, Plaintiff fell asleep within 10 minutes. Panic attacks wakened Plaintiff at night, and she could not sleep because of pain. Because of her disabilities, Plaintiff had been late to work, had needed to leave work early, and could not maintain regular attendance at work. Plaintiff did not leave home to see friends, and needed to have her children with her when she shopped because she was forgetful and had panic attacks.

Plaintiff had neuropathy on her left side and swelling in her feet. She had asthma, used two inhalers, and was winded from climbing the stairs in her apartment. Her medications caused stomach pain and diarrhea. She had migraine headaches twice a month, experienced panic attacks daily, became dizzy, and could not reach because of her poor balance.

**Vocational Expert**

The ALJ posed a vocational hypothetical describing an individual with Plaintiff's age, education, and work experience who could perform light exertional level activities subject to

FINDINGS AND RECOMMENDATION - 10

these limitations: The individual could only occasionally stoop, crouch, crawl, climb ramps/stairs, and could occasionally use her right leg for repetitive movement such as operating foot controls; should not kneel, climb ladders, ropes or scaffolds, should avoid concentrated exposure to vibration, dust, fumes, and gases; and could not operate automotive equipment; could understand, remember, and carry out short, simple instructions; and should have only superficial interaction with the public and coworkers.

The VE testified that the restriction to minimal contact with the public and coworkers and the limitation to work requiring only short, simple instructions would preclude performance of Plaintiff's past relevant work. She testified that the individual described could work as a small products assembler, an electronics worker, or a packing line worker.

The ALJ then modified the hypothetical by imposing a limitation to sedentary work. The VE testified that the described individual could work as a semi-conductor wafer breaker, a microfilm document preparer, or as an addresser.

Plaintiff's counsel asked the VE whether an individual whose health problems resulted in more than two absences per month would be able to sustain employment. The VE testified that such an individual was precluded from employment, and that an individual whose productivity dropped by 10% or more for any reason, including an inability to focus or concentrate, could not work competitively.

Plaintiff's counsel also asked the VE to name 25 employers in the local area who employed addressers. The ALJ instructed the VE not to answer, and refused to allow this inquiry.

**Lay Witness Statement**

Dolores Johnson, Plaintiff's mother, completed a "FUNCTION REPORT-ADULT-THIRD PARTY" form provided by the Agency.  Ms. Johnson reported that Plaintiff had difficulty sleeping, experienced some limitations with personal care, prepared simple meals by herself, lacked focus, was easily distracted and forgetful, and needed help doing housework.  She stated that Plaintiff was anxious and fearful at times, usually left the house only for medical appointments, and needed the children to help her when she shopped.

## **ALJ's Decision**

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since applying for SSI on January 12, 2007.

At the second step, the ALJ found that Plaintiff had the following severe impairments: asthma, degenerative joint disease in the knees, obesity, anxiety, and depression.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the Listings, 20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC).  He found that Plaintiff retained the capacity required to perform sedentary work

> except for occasional crouching, crawling; no kneeling; occasional climbing stairs and ramps, but no climbing ladders, ropes, or scaffolds; occasional use of the right leg in repetitive movements such as operating foot pedals; avoid concentrated exposure to dust, fumes, gasses, and vibration; no operating automotive equipment; understand, remember, and carry out short, simple instructions; only superficial interaction with co-workers and the general public.

In reaching this conclusion, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the symptoms Plaintiff alleged, but that her

statements concerning the intensity, persistence, and limiting effects of the symptoms were not

credible to the extent they were inconsistent with the assessed RFC.

At the fourth step of his disability analysis, the ALJ found that Plaintiff could not

perform her past relevant work.

Based upon the testimony of the VE, at the fifth step, the ALJ found that Plaintiff could

perform other jobs that existed in substantial numbers in the national economy.  The ALJ cited

work as a semi-conductor wafer breaker, microfilm document preparer, and addresser as

examples of such jobs.  Based upon this finding, he concluded that Plaintiff was not disabled

within the meaning of the Act.


**Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by

reason of any medically determinable physical or mental impairment which . . . has lasted or can

be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

 423(d)(1)(A).  Claimants bear the initial burden of establishing disability.  Roberts v. Shalala,

66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears

the burden of developing the record,  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991),

and bears the burden of establishing that a claimant can perform "other work" at Step Five of the

disability analysis process.  Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole.

42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or
detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.
1986).  The Commissioner's decision must be upheld, however, even if "the evidence is
susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

**Discussion**

Plaintiff contends that the ALJ erred in finding that depression did not meet or equal a
presumptively disabling impairment set out in the listings, erred in failing to obtain an updated
expert medical opinion as to her psychological condition, erred in concluding that Plaintiff was
not wholly credible and in rejecting the testimony of lay witnesses, and erred in failing to follow
mandatory Agency requirements when assessing her RFC.

## 1. **Conclusion the Plaintiff's Depression did not Meet or Equal a Listed Impairment**

Plaintiff contends that the ALJ erred in concluding that her mental impairments did not
meet or medically equal the requirements for finding disability under the Listings 12.04
(Affective Disorders), and 12.06 (Anxiety-Related Disorders).  Those requirements  are satisfied
if a claimant meets the requirements of both Paragraphs A and B, or the requirements of
Paragraph C are satisfied.  See 20 C.F.R. pt. 404, subpt. P. App. 1, §§ 12.04, 12.06.  Paragraph A
requires medical findings of persistent depression or anxiety disorders, and Paragraph B requires
that the relevant impairments result in two of the following: 1) marked restriction in activities of
daily living; 2) marked difficulties maintaining social functioning; 3) marked difficulty
maintaining concentration, persistence, or pace; or 4) repeated extended episodes of

decompensation.  Id.  The requirements of 12.04(C) are satisfied if the claimant has a

"[m]edically documented history of a chronic organic mental disorder [or affective disorder] that

has lasted at least 2 years and has caused more than a minimal limitation in the ability to do basic

work activities, with symptoms or signs currently attenuated by medication or psychosocial

support and either 1) repeated episodes of decompensation of extended duration; 2) a residual

disease process that has resulted in such marginal adjustment that a minimal increase in mental

demands or change in the environment would likely result in decompensation; or 3) a current

history of 1 or more years of inability to function outside a highly supportive living arrangement,

with an indication of continued need for such an arrangement.  Id. at 12.04(C).  Paragraph C of

Listing 12.06 is satisfied only if the claimant has a "complete inability to function independently

outside the area of one's home."  Id. at 12.06(C).

 The parties agree that Plaintiff was diagnosed with mental impairments that satisfy the

requirements for Paragraph A.  The question is whether substantial evidence supported the ALJ's

conclusion that Plaintiff's mental impairments did not meet the requirements for Paragraph B or

C.

 Plaintiff contends that the ALJ erred in finding that her depression did not meet the

listings because "her doctors and counselors . . . have consistently diagnosed Plaintiff with Major

Depressive Disorder, Generalized Anxiety Disorder and PTSD."  She notes that one of her

treatment providers was concerned that she "would become completely housebound due to her

depression, anxiety and insomnia if [her] children move out and no longer care for her."

Plaintiff contends that her assessed GAF score of 75 was not a clear and convincing basis on

which to "discredit" her "treating source opinions . . . ."  She argues that the ALJ failed to apply

the correct legal standard regarding medical evidence showing that she has marked limitations in

FINDINGS AND RECOMMENDATION - 15

maintaining social functioning, activities of daily living, and difficulties in concentration, persistence, and pace.

A careful review of the ALJ's decision and the medical record does not support these contentions. The ALJ cited the correct legal standard for determining whether Plaintiff's mental impairments met or equaled the criteria for Listings 12.04 and 12.06, and explained his assessment of the level of difficulty Plaintiff experienced in the relevant areas. He concluded that Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in social functioning and in concentration, persistence or pace, and addressed these impairments more thoroughly later in his decision. The ALJ correctly noted that the record did not establish that Plaintiff had experienced episodes of decompensation of extended duration, and his conclusion that the record "fails to establish the presence of the `paragraph C' criteria" was supported by substantial evidence.

Plaintiff has not established that the ALJ erred in concluding that her depression did not meet or equal a presumptively disabling impairment defined in the Listings.

2. **Failure to Obtain Updated Medical Expert Opinion**

Plaintiff contends that, if this court "cannot determine Plaintiff meets/equals the listing, a remand for further investigation is required." She argues that the ALJ failed to fully and fairly develop the record concerning her mental impairments, and asserts that "the ALJ should have ordered a psychological exam to fully assess Plaintiff's mental limitations and concentration, pace and persistence problems pursuant to his duty to develop the record." In support of this

assertion, she notes that Dr. Henry, "a DDS doctor, admitted that records reviewed were `insufficient to address the nature and severity of Claimant's impairments' to accurately determine Claimant's mental RFC in the absence of sufficient treating records." She also contends that Drs. Rethinger and Westfall, Agency non-examining doctors "opined that Claimant's depression and physical problems were not severe, in direct contrast to Plaintiff's medical records." Plaintiff contends that these doctors failed to address the "serious effects" of her sleep disorder, and mischaracterized her independence and her therapist's reports. She also notes that the ALJ observed that it was unclear whether Dr. King intended to release Plaintiff from <u>all</u> future work obligations with her employer, or intended that she be excused from work only until her health had improved.

The ALJ has a duty to fully and fairly develop the record, and to ensure that a claimant's interests are considered. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001). However, an ALJ is required to further develop the record only if the existing evidence is ambiguous, or if the record is inadequate to allow for "proper examination of the evidence." <u>Id.</u> A consultative examination is required only if the medical and nonmedical record is not sufficient to support a decision or the record includes ambiguities that cannot be resolved based upon information in the records of a claimant's treating sources. <u>Reed v. Massanari</u>, 270 F.3d 838, 842 (9th Cir. 2001); 20 C.F.R. §§ 404.1512(f), 416.912(f).

A careful review of the administrative record and the ALJ's decision do not support Plaintiff's contention that the ALJ lacked the evidence required to make a reasoned decision, or that the record included ambiguities that could not be resolved based upon the existing records. The record does show that, in a "narrative" addressed to a colleague dated March 21, 2007, Dr. Henry stated that records from Plaintiff's treating physician indicated that Plaintiff had been

treated for alleged depression and PTSD, but lacked the detail needed to address the "nature and severity" of those impairments.  Dr. Henry suggested that Plaintiff be contacted to determine if other records concerning treatment of these impairments might be available.

From the administrative record, I cannot determine with confidence what steps, if any, were taken to obtain additional records.  However, because he subsequently completed a Psychiatric Review Technique fully addressing Plaintiff's mental impairments, it is clear that Dr. Henry himself was satisfied that he had the information needed to assess Plaintiff's condition, and to evaluate whether Plaintiff's mental impairments met or equaled an impairment in the Listings.  Dr. Henry cited Plaintiff's depression and anxiety with occasional panic attacks and specifically assessed the severity of the functional limitations attributable to those impairments. The Psychiatric Review Technique that Dr. Henry completed provided a "check the box" space for indicating if the evidence was insufficient to allow for assessment of functional limitations. Dr. Henry left the boxes blank, and no other Agency non-examining doctors stated or implied that more information was needed to evaluate the severity of Plaintiff's mental condition.

In his decision, the ALJ thoroughly reviewed the substantial medical and non-medical records, fully addressed the opinions of Plaintiff's medical providers, and reasonably concluded that Plaintiff's depression and anxiety were "severe" impairments.  Though he indicated uncertainty as to the duration of the "release" requested by Dr. King, there is no basis for concluding that any ambiguity as to that question required a consultative examination.   In his discussion of Ms. Lallande's opinion, the ALJ noted that Plaintiff's inability to perform her past work does not require a finding of disability, and he cited substantial evidence in support of his own conclusions that Plaintiff's mental impairments did not meet or equal an impairment in the Listings, and that Plaintiff could perform "other work."  In his evaluation of Plaintiff's RFC, the

FINDINGS AND RECOMMENDATION - 18

ALJ noted that Plaintiff's GAF score of 75 indicated "no more than slight impairment in social, occupational, or school functioning . . . ."

The ALJ is responsible for evaluating medical evidence, Carmickle v. Commissioner, 533 F.3d 1155, 1164 (9th Cir. 2008), and for resolving ambiguities in the medical evidence. Tommasetti v. Astrue, 533 F.2d 1035, 1041 (9th Cir. 2008). Here, the medical evidence was sufficient to permit a reasoned analysis and resolution of any ambiguities as to the severity of Plaintiff's mental impairments. Plaintiff has not shown that the ALJ erred in failing to order additional psychological examination.

3. **ALJ's Credibility Determinations**

A. **Plaintiff's Credibility**

The ALJ found that Plaintiff had medically determinable impairments that could reasonably be expected to cause some of the symptoms she alleged, but concluded that her "statements concerning the intensity, persistence and limiting effects of symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." Plaintiff contends that the ALJ failed to provide the required support for this conclusion.

**Evaluating Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464

F.3d 968, 972 (9th Cir. 2006).  If substantial evidence supports the ALJ's credibility

determination, that determination must be upheld, even if some of the reasons cited by the ALJ

are not correct.  <u>Carmickle v. Commissioner of Social Security</u>, 533 F.3d 1155, 1162 (9th Cir.

2008).

     The ALJ must examine the entire record and consider several factors, including the

claimant's daily activities, medications taken and their effectiveness, treatment other than

medication, measures other than treatment used to relieve pain or other symptoms, and "any

other factors concerning the individual's functional limitations and restrictions due to pain or

other symptoms."  SSR 96-7.

**<u>Analysis</u>**

     Plaintiff here produced medical evidence of underlying impairments that could

reasonably be expected to produce some of the symptoms she alleged, and there was no evidence

of malingering.  The ALJ was therefore required to provide clear and convincing reasons for

concluding that she was not wholly credible.

     In support of his credibility determination, the ALJ asserted that Plaintiff's "allegations

of disability and disabling pain" were not consistent with the objective medical record.  The ALJ

correctly noted that Plaintiff's assessed GAF score of 75 indicated only slight impairment in

social or occupational functioning, and that, at this level of impairment, symptoms were

expected to be transient.  This was an acceptable basis upon which to discount Plaintiff

credibility, because   the inconsistency of a claimant's testimony with the medical records is a

legitimate basis for discounting a claimant's credibility. <u>Id.</u> at 1161; SSR 97-6p (consistency of

claimant's testimony "both internally and with other information in the case record" is

significant indication of a claimant's  credibility).

FINDINGS AND RECOMMENDATION - 20

The ALJ next asserted that the record of "medical treatment and use of medication" was inconsistent with "claimant's allegations of disability and disabling pain." He cited medical records supporting his assertion that Plaintiff had received treatment that was "essentially routine and/or conservative in nature," and that treatment had been generally effective. This supported his credibility finding because evidence of conservative treatment supports discrediting a claimant's testimony as to the severity of impairment, Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995), and the effectiveness of treatment is relevant in assessing the severity of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

The ALJ also noted that the record did not show that Plaintiff followed up on recommendations to improve her "sleep hygiene" following a sleep study, and asserted that this failure suggested that her symptoms were not as severe as she alleged. He also noted that Plaintiff had missed many of her scheduled counseling appointments. These were legitimate bases for discounting Plaintiff's credibility, because failure to seek treatment and failure to follow treatment prescribed are relevant in assessing a claimant's credibility. Molina v. Astrue, 674 F.3d 1004, 1113 (9th Cir. 2012). Here, failure to follow up on recommendations that could improve sleep is particularly significant, because Plaintiff asserts that a sleep disorder is her most significant problem.

These are legitimate, clear and convincing reasons for discounting Plaintiff's credibility. In addition to these reasons, the ALJ cited two bases for discounting Plaintiff's testimony which are not clear and convincing. In the first of these, the ALJ asserted that Plaintiff's activities of daily living are inconsistent with her allegations that she cannot perform work functions. He noted that Plaintiff testified that she does very little cooking, supervises cleaning the dishes and laundry, uses public transportation, and needs to have her children shop with her because she

forgets what she needs to buy.  The ALJ noted that she also testified that she became panicked and fearful if her shopping companion left her side while she was in the store, that she spent most of the day sitting around the house, and that, while doing so, she needed to change positions in order to be comfortable.  He also stated that plaintiff was "able to engage in sedentary level activities throughout the day such as watching television and reading."  However, the ALJ's description of these activities is not inconsistent with Plaintiff's own testimony, and it appears doubtful that an individual who functioned in the manner that Plaintiff described could sustain employment at any exertional level.

The ALJ also stated that, in assessing her credibility, he had considered Plaintiff's  work history.  Though he noted that Plaintiff had testified that she lost jobs because of her limitations, the ALJ did not indicate why that testimony was not credible, or why it might undermine other aspects of Plaintiff's testimony concerning her functional limitations.  He further noted that Plaintiff "stated that, in her opinion, she could not perform any of her past jobs because she lacks focus and energy."  Given that the VE testified that an individual who could carry out only short, simple instructions, could not perform Plaintiff's past relevant work, and that the ALJ agreed that Plaintiff could not perform that work, this is not a persuasive basis for discounting Plaintiff's credibility.  In addition, the ALJ asserted that Plaintiff sought to "bolster her allegations by testifying to being 'released' from work by one of her Physicians."  He observed that it was not clear whether the doctor in question had asked for Plaintiff to be "released" from all further work, or simply until her health improved.  However, he did not indicate why Plaintiff's reference to the release reflected poorly on her own credibility, and no such negative implication is apparent.

Though he cited two inadequate reasons for discounting Plaintiff's credibility, the ALJ cited other clear and convincing reasons for his credibility determination, and his assessment was supported by substantial evidence. Under these circumstances, the credibility determination should be upheld. See, e.g., Carmickle 533 F.3d at 1162 (where supported by substantial evidence, ALJ's credibility determination upheld even if some reasons offered are incorrect).

B. **Lay Witness Testimony**

In her opening memorandum, Plaintiff contends that the ALJ failed to provide an adequate basis for rejecting the testimony of her "witness." Though she does not identify that witness, her description of the witness testimony corresponds to that offered in a third-party statement submitted by Dolores Johnson, her mother, and I have found no other similar third-party statement in the record. However, in her reply memorandum, Plaintiff refers to "lay witnesses' " statements, and asserts that the ALJ failed to articulate an adequate basis for rejecting "Mr. Shinbo and Mr. Blackledge's testimony and witness' statement. . . ." This is the only reference to Messrs Shinbo and Blackledge that appears in the parties' memoranda, and a computerized word search of the entire administrative record yields no mention of these individuals. In his responding memorandum, the Commissioner both asserts that the ALJ "believed that the lay witnesses" testified honestly, and refers in the singular to Plaintiff's "lay witness."

Because the parties' memoranda describe the testimony of Ms. Johnson, and I am unable to locate witnesses statements from any other lay witnesses in the administrative record, I assume that Messrs Shinbo and Blackledge offered no testimony relevant here, and will address only Ms. Johnson's statements.

Ms. Johnson completed a form provided by the Agency entitled "FUNCTION REPORT-ADULT-THIRD PARTY."  She  reported that Plaintiff had difficulty sleeping, experienced limitations with personal care, prepared only simple meals by herself, lacked focus, was easily distracted and forgetful, could not follow oral instructions, and needed help doing housework. She stated that Plaintiff was anxious and fearful at times, usually left the house only for medical appointments, and needed the children to help her when she shopped.

The ALJ noted that Ms. Johnson's observations were "generally consistent with the claimant's alleged activities of daily living."  He found that her statements were "generally credible but of limited value" in determining Plaintiff's RFC because she "is not knowledgeable in the medical and/or vocational fields and thus is unable to provide an objective critical assessment on how the claimant's impairments affect her overall abilities to perform basic work activities at various levels."

Lay testimony concerning a claimant's symptoms or reporting how an impairment affects a claimant's ability to work is competent evidence which an ALJ must consider.  Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1995); Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).  By definition lay testimony is given by witnesses who are not "expert," and ALJs are required to consider evidence from witnesses who are not expert sources.  See  20 C.F.R. § 404.1513(e)(2).  An ALJ who rejects lay witness testimony must provide "germane" reasons for doing so.  Id.

The ALJ clearly erred in discounting Ms. Johnson's testimony based upon her lack of medical or vocational expertise, because the lack of such special knowledge is not a "germane" basis for discounting lay witness testimony.  Here, the Agency provided the "third-party" form that Ms. Johnson completed.  The form did not seek information as to the recipient's medical or

vocational expertise, and did not state or imply that the information provided might be relevant only if the individual completing it had special knowledge or training. Nor did the form ask for the "objective critical assessment" of the effect of Plaintiff's impairments on the ability to work which the ALJ asserted was needed to render the information useful.

The Commissioner implies that, because he concluded that Ms. Johnson testified honestly, the ALJ did not actually reject her testimony. He argues that, in any event, nothing in Ms. Johnson's testimony compels a finding that Plaintiff was more limited than was reflected in the ALJ's RFC, and that nothing in her testimony compelled a finding of disability.

These arguments fail for two reasons. First, an ALJ who does not credit a lay witness's testimony "rejects" that testimony whether he believes it was honestly given or not. Second, Ms. Johnson described impairments that were significantly more severe than those reflected in his RFC assessment. Ms. Johnson testified that Plaintiff was unable to sleep at night, had severe problems with concentration and memory, needed help 90% of the time to complete simple household chores, could not follow oral instructions, had severe anxiety and social difficulties, was "overwhelmed" most of the time, had difficulty leaving the house, needed help with shopping, and lacked social skills required to get along with others. The ALJ's RFC assessment does not fully incorporate these functional impairments.

In Smolen, 80 F.3d at 1292, the ALJ failed to provide adequate reasons for rejecting lay witness testimony, and the court ordered a remand for an award of benefits. However, there, unlike here, the court concluded that the ALJ had also erred in rejecting the opinions of the Plaintiff's treating physicians, in rejecting the Plaintiff's own testimony, and in finding that the Plaintiff could work. The court applied the three-part test typically used in the Ninth Circuit to determine whether an ALJ's error requires remand for an award of benefits or only for further

FINDINGS AND RECOMMENDATION - 25

proceedings.  Id., (citations omitted).  Under that test, remand for an award of benefits is appropriate if an ALJ has improperly rejected the plaintiff's evidence, the record is fully developed, and it is clear that a finding of disability would be required if the improperly rejected evidence were accepted.  Id.

Here, the ALJ failed to provide adequate reasons for rejecting evidence from a lay witness and the record is fully developed.  However, it is not clear that the ALJ would have been required to find Plaintiff disabled if he had accepted the lay witness evidence.  Though Ms. Johnson described Plaintiff as significantly impaired, the ALJ cited and discussed other substantial evidence supporting the conclusion that Plaintiff retained the functional capacity required to work.  Under these circumstances, remand for an award of benefits is not appropriate.

Though remand for an award of benefits is not appropriate, this action should be remanded for reexamination of the lay witness testimony, because the testimony corroborated Plaintiff's own testimony and supported the conclusion that Plaintiff was disabled.  On remand, an ALJ should be required to either credit Ms. Johnson's  testimony or provide truly "germane" and legitimate reasons for its rejection.  If the ALJ accepts the testimony, Plaintiff's own credibility, Plaintiff's RFC, and the ultimate question of disability should be reexamined as well.

4. **Compliance With Requirements of SSR 96-8p in Evaluating RFC**

Plaintiff correctly notes that SSR 96-8p requires that an ALJ identify a claimant's functional limitations on a "function-by-function basis, assess a claimant's ability to perform work functions full time on a sustained basis, include a narrative discussion describing how the

evidence supports the conclusions reached, and explain how any material inconsistencies or ambiguities in the evidence have been resolved.  She contends that the ALJ failed to meet that responsibility here, and that the VE testified that an individual with her limitations is not employable.

I disagree.  In his assessment of Plaintiff's  RFC, the ALJ  thoroughly addressed the medical record, including medical findings and opinions.  He adequately discussed the reasons underlying his RFC assessment, which limited Plaintiff to sedentary work and imposed other significant restrictions.  The ALJ addressed and resolved conflicts and ambiguities in the medical record, and substantial evidence supported his RFC assessment.  In addition, the VE did not testify that Plaintiff's RFC precluded competitive employment: She instead testified that the severity of the impairments Plaintiff alleged would preclude employment.  That is a different matter.

## Conclusion

A judgment should be entered REVERSING the Commissioner's decision and REMANDING this action to the Agency for further proceedings.  The judgment should require an ALJ to reconsider the assessment of the lay witness testimony discussed above, and to either provide "germane" reasons for rejecting the testimony, or to credit the testimony and reconsider Plaintiff's own credibility, reassess Plaintiff's RFC, and reassess the question of disability in light of that testimony.

FINDINGS AND RECOMMENDATION - 27

**<u>Scheduling Order</u>**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due November 19, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 1st day of November, 2012.


    /s/ John Jelderks         
John Jelderks
U.S. Magistrate Judge